IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARILYN CLARK, et al.          :          CIVIL ACTION
                               :
          v.                   :
                               :
COMCAST CORP., et al.          :          NO. 08-52

MEMORANDUM

Bartle, C.J.                                    August 25, 2008

This is a putative securities class action brought on behalf of the shareholders of Comcast Corporation ("Comcast") against Comcast, its Chief Executive Officer, Brian Roberts, and its Chief Operating Officer, Stephen Burke.

In Count I of their Amended Complaint, plaintiffs allege that defendants defrauded investors by artificially inflating the value of Comcast common stock by making false and misleading statements regarding the company's financial outlook in violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Count II of the Amended Complaint, based on the same factual allegations, seeks to hold defendants Roberts and Burke jointly and severally liable with Comcast under § 20(a) of the Securities and Exchange Act, 15 U.S.C. § 78t.

Now before the court is the motion of defendants to dismiss plaintiffs' Amended Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78u-4,

*et seq.*  In their motion to dismiss, defendants contend that the Amended Complaint fails to:  (1) plead the basis of its allegations with particularity; (2) allege a statement or omission that is actionable under the securities laws; (3) allege scienter sufficiently; and (4) allege loss causation.

I.

In reviewing the factual background of this litigation, we accept as true the well-pleaded allegations in the Amended Complaint and consider the documents incorporated by reference therein.  <u>Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.</u>, 394 F.3d 126, 134 (3d Cir. 2004).

Plaintiffs bring this suit as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.[1]  The putative class is defined as all those who purchased the publicly-traded securities of Comcast between February 1, 2007 and December 4, 2007, excluding the defendants, other officers and directors of Comcast at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

Comcast is a publicly-held Pennsylvania corporation which maintains its executive offices in Philadelphia.  It is the largest cable operator in the United States, offering a variety

---

1.  Lead Plaintiff in this matter is Iron Workers District Council, Southern Ohio & Vicinity Pension Trust.  On May 5, 2008, the court granted the motion of plaintiffs to appoint lead plaintiff and to approve selection of lead and liaison counsel.

of consumer entertainment and communications products and services.  At all relevant times, Comcast stock traded on the NASDAQ Stock Market.

A.

According to the Amended Complaint, Comcast issued a press release on February 1, 2007 announcing its financial results for the fourth quarter and year ending December 31, 2006. It was a record-setting year for Comcast, and defendant Roberts stated in the press release that "[Comcast's 2006] performance demonstrates substantial operating momentum, and we could not be more enthusiastic about the future."  Roberts attributed much of Comcast's 2006 success to their "Triple Play" offering, which bundled internet, cable and telephone services for a promotional price of $99 a month for the first year.

In the same February 1, 2007 press release, Comcast reported its "2007 Financial Outlook."  It projected, among other things, that in 2007 it would obtain:  (1) cable revenue growth of at least 12%; (2) cable Revenue Growth Unit ("RGU")[2] net additions of approximately 6.5 million, which was 30% above the 2006 net additions of five million, and included an expected decrease of 500,000 circuit-switched phone RGUs; and (3) cable capital expenditures of approximately $5.7 billion.

---

2.  The term "Revenue Growth Unit" describes the number of discrete services (such as cable, internet or telephone) to which Comcast customers subscribed.  For example, if one customers subscribed to Comcast's Triple Play offering and received cable, internet and telephone services, that customer's subscription would represent three RGUs.

Also on February 1, 2007, defendants held a conference call with analysts to discuss Comcast's 2006 results and 2007 outlook.  During this conference call, defendant Roberts stated that:

> The Company has never been stronger.  We continue to be extremely bullish about our future and the positioning in 2007 in revenue and cash flow growth.  And let me take a minute and ... talk in specifics about our outlook.
>
> We believe, and this is probably the single most important point that I've been making for many months, that we have a moment in time first-to-market advantage.  And that the momentum we have will allow us to give guidance that we will do 30% more RGUs in 2007 than we did in 2006, getting us to around 6.5 million RGUs in one year.  We think we can capture market share now and this is the time to extend our lead in the market.  We're going to invest capital to drive that growth.  We're going to expand capacity to support future RGU growth beyond this and to continue to innovate new products and new businesses.

During the conference call, similar bullish statements were repeated by defendant Burke as well as by John Alchin ("Alchin"), Comcast's Co-Chief Financial Officer, Executive Vice President and Treasurer.  Burke commented that:  "[W]e are pretty darn excited that the momentum that we have built in '06 is going to accelerate and that our main focus is to sell more RGUs."  Alchin added that "[RGU growth] shows that the best is yet to come," and that "Basic subs are expected to grow even more in 2007 than they did in 2006."

Analysts responded to the February 1 press release and conference call by writing favorable reports regarding Comcast. Between February 1 and February 22, 2007, Comcast common stock traded between $39 and $43 a share.  On February 22, Comcast announced a 3 for 2 stock split, which reduced its share price to $27.45.

On April 26, 2007 Comcast issued a press release announcing its financial results for the First Quarter of 2007, which ended March 31, 2007.  In anticipation of the release of these results, Roberts was interviewed on Bloomberg TV on April 11.  He stated with respect to the 2007 outlook:  "Right now it's all clicking, the business is on fire."  Between April 11 and April 26, Comcast common stock traded at prices as high as $28.18.

The April 26, 2007 press release reported RGUs of 1.8 million for the first quarter.  In it, Roberts was quoted as follows:

> We are off to a fabulous start to the year
> and see increasing momentum as we move ahead.
> Strong consumer demand for our superior
> products delivered through our Triple Play
> offering resulted in another quarter of
> record performance at our cable division –
> and we are just getting started capitalizing
> on the Triple Play opportunity.  This was our
> 3rd consecutive quarter of record-breaking
> RGU growth and 27th consecutive quarter of
> double digit OCF growth.  We are highly
> confident that our strategy and focus on
> operational execution and product innovation
> will deliver great results in 2007 and
> beyond.

Defendants participated in a conference call with analysts the same day, during which Roberts said, among other things, that "[E]very one of our business lines is performing at or better than we had thought, the momentum is growing .... We're very bullish on the full year ....  We're not changing any guidance ....  But I have to tell you, I think the momentum is fantastic."  Burke added that:

> [W]e're taking a lot of momentum into the second quarter and a lot of the things that we've done in terms of infrastructure in the first quarter will pay off in the second, third and fourth quarters.  So in total 2007 looks like it's going to be a very strong year.
>
> *     *     *
>
> We're off to a very strong start and if that continues there's no reason why we can't do better than we thought we would do when we gave guidance three months ago.

Analysts responded positively to defendants' April 26 representations, particularly to defendants' reiteration of the 2007 outlook.

Comcast held its 2007 Analyst and Investor Meeting on May 1, 2007.  A Comcast press release dated the same day had Roberts saying that:

> The triple play is driving incredible operating momentum and we see that accelerating as it continues to roll out. ...  The fundamentals of our business are extremely strong and we have never been more enthusiastic about the future of our company.
>
> *     *     *
>
> The Company believes that its financial performance will remain strong for the next several years:

-6-

- Cable revenue projected to grow a compounded average of 12% per year for 2007-2009.

- Cable Operating Cash Flow (OCF) projected to grow a compounded average of 14% per year for 2007-2009.

- Comcast Digital Voice (CDV) projected to reach a penetration level of 20-25% of the Company's available homes passed.

During presentations given during the May 1 Meeting, upbeat statements were made by Burke and Michael Angelakis ("Angelakis"), Comcast's Co-Chief Financial Officer and Executive Vice President.  In particular, Angelakis remarked that:

I also believe, and as you have heard today, that this level of predictability is increasing each day with the successful deployment of the Triple Play.  We're generating higher ARPUs and we're reducing churn, and this is an accelerating, positive dynamic.  It's pretty clear to me that this stability is unprecedented.

*     *     *

... This business is increasingly predictable and is resilient to the external ... economic pressures.

*     *     *

I tell you, I love the hand we've been dealt. I am very bullish on the company's growth ...

As a result of these statements, analysts reported favorably about Comcast the following day.

Plaintiffs highlight in their Amended Complaint two additional statements made by Roberts during the second quarter. The first occurred at the Sanford Bernstein 23rd Annual Strategic Decisions Conference on May 30, 2007, and the second at the

Merrill Lynch US Media Conference on June 7, 2007.  Each of these statements echos Roberts' previously expressed confidence in the strength of Comcast's business and his continued expectation of positive momentum.

Between April 26 and July 25, 2007, the price of Comcast common stock traded as high as $29 a share.  Defendants Roberts and Burke each sold shares of their stock during this period.  On May 24-25, Roberts sold 350,000 shares of common stock at prices of $26.80 and $27, for over $9.4 million.  Then, on June 4, Burke sold 235,792 shares at prices between $27 and $27.15, for $6.4 million.

Comcast made public its financial results for the second quarter, the period ending June 30, 2007, on the morning of July 26, 2007.  For the quarter, Comcast reported an increase in RGUs of 1.6 million and capital expenditures of $1.6 billion. It also noted that it lost 95,000 basic video subscribers during that period.  Comcast's accompanying press release reaffirming the 2007 outlook contained the following statement by Roberts: "We are on track for another outstanding year as we continue to execute on our time-to-market advantage.  We see cable growth accelerating in the second half of 2007 as we remain focused on delivering superior products and services to our customers."

During a conference call with analysts the same day to discuss the second quarter results, Roberts, Alchin and Burke each made statements.  According to Roberts:

-8-

> We are on track to achieve all of our goals
> this year as Cable growth accelerates in the
> second half of 2007.  We continue to be very
> bullish about the future and expect the
> strength and momentum of our business to
> continue to deliver this kind of growth for
> years to come.

*     *     *

> [T]he third quarter has always been better
> for high-speed data than the second quarter
> ....  We consider and feel that it's going to
> get bigger than it was in any prior quarter.
> So we're still going up the mountain.

*     *     *

> ... So I think we have the business really
> operating very strongly.  You would not trade
> our position.  We're questioning 12% of
> revenue, whether we can make it more ....
> And I think we are on track for the full year
> as a big picture.  So I think we've basically
> left all of the guidance unchanged because at
> the macro level, that's how we see things.

*     *     *

> ... [I]f history's any guide ... assume that
> the first half of the year was going to be
> less than the second half for RGUs, and we
> would expect that to play out.

Alchin commented that:  "We expect a decline in Cable CapEx in
the second half of 2007 due to a decrease in variable capital
expenditures. ...  We expect Cable CapEx as a percentage of
revenue in the second half of the year to decline."  Burke
confirmed the statements of his colleges which suggested that
Comcast's performance during the second half of 2007 would only
improve:

> [W]e don't consider [second quarter
> subscriber loss] a cause for concern.  Some
> of it is just the normal seasonality of the

-9-

business which is very hard to market
against.

          \*      \*      \*

[I]f you look at the trends in the Comcast,
the classic, what we call classic Comcast
systems, they're actually pretty good .... I
think the second half of the year is going to
look a lot like the second half of last year
and maybe an [sic] even a little bit better.
We certainly don't see the sort of micro
trends changing too dramatically in the
business. We have an inkling of what the
third quarter is going to look like because
we're done with the month of July, or almost
and the trends look pretty strong.

As a result of the reports on July 26, 2007, the price
of Comcast common stock fell from $28.54 on July 25, 2007 to
$27.21 on July 26, 2007, a 4.7% decline. Despite Comcast's mixed
results for the second quarter, however, analysts continued to
report favorably on the stock.

During the month of September, 2007, defendants Roberts
and Burke each gave statements affirming their continued
confidence in Comcast's ability to meet the 2007 outlook,
particularly its ability to achieve 6.5 million cable RGUs before
the end of the year. Both defendants expressed their belief
that, although competition had increased, Comcast's products were
superior and the company was fundamentally strong.

On October 25, Comcast published a press release
announcing its financial results for the third quarter of 2007,
the period ending September 30 of that year. For the quarter,
Comcast reported RGU additions of only 1.4 million, which was
less than analysts had expected based on defendants' earlier

reassurances.  Comcast also announced an increase in capital expenditures that was higher than anticipated by analysts as well as a loss of 65,000 video subscribers.  Despite these events, defendants again reaffirmed the same optimistic 2007 outlook.  In a press release, Roberts noted that "Our business continues to perform well both operationally and financially," and that Comcast had a "competitive advantage" that would "fuel our growth well into the future."

On October 25, defendants held another conference call with analysts.  During the call, Angelakis commented:

> We also remain focused on achieving our goal of adding 6.5 million net RGUs for the year, a 30% increase over 2006 ...
>
> *     *     *
>
> We are maintaining our guidance of cable capital expenditures of approximately $5.7 billion for 2007.
>
> ... As we finish the year, we expect that the fourth quarter will see additional growth in operating cash flow and a reduction in CapEx, which will result in increased free cash flow in the fourth quarter.

Roberts likewise remained positive, though he acknowledged an increase in competition:

> We are seeing increasing competition and a softer economy and as a result, a slightly lower growth rate ....
>
> [W]e are now more comfortable than ever that 2007 represents our peak year in terms of capital expenditures as a percentage of revenue and that we will reaccelerate free flow growth in 2008.
>
> *     *     *

-11-

> We are very confident about the strength and long-term prospects of our business. We are realistic about some of the business challenges, but nowhere do I see a more fundamentally strong and growing company in the telecom and entertainment sector.

Burke expressed similar sentiments:

> The combination of increased competition and a slowing economy impacted our RGU net adds during the quarter but importantly these trends don't change the fundamental growth prospects for our business.

*     *     *

> With regards to CapEx, in the fourth quarter we clearly expect CapEx to come down, and we are maintaining the guidance we did for the year on cable CapEx.

As a result of the third quarter disclosures, the price of Comcast common stock fell from $23.85 per share on October 24 to $21.28 per share on October 25, 2007, a decline of approximately 11%.

Forty days later, on December 4, 2007, Comcast issued a press release announcing that it was materially revising its 2007 outlook as follows: cable RGU's of six million for the year, a decrease of 500,000, or 7.7%; cable capital expenditures of approximately $6 billion for the year, an increase of $300 million, or 5%; and cable growth revenue for the year approximating 11% instead of 12%. The press release explained that the revision "reflected an increasingly challenging economic and competitive environment and [was] consistent with trends across the sector." Based on these disclosures, the price of

Comcast common stock fell an additional $2.55 per share, or
12.3%, from $20.73 on December 4, 2007 to $18.18 per share on
December 5, 2007.

B.

Plaintiffs contend that each of defendants' bullish
statements between February 1 and December 4, 2007, as outlined
in their Amended Complaint, were materially false and misleading
and were made without any reasonable basis.  Plaintiffs assert
that when defendants made those statements, they knew or
recklessly disregarded certain material facts which were not
disclosed to the public and which would have substantially
altered analyst and investor decisions with respect to Comcast's
common stock.

These alleged undisclosed facts include the following:

(1)  Competition:  By the beginning of 2007, aggressive
competition from other providers was negatively affecting the
number of Comcast's RGUs and was forcing it to spend more to
attract and retain customers.  This adverse trend worsened
throughout the first quarter.  In addition, throughout the second
and third quarters, the business environment in which Comcast was
operating grew increasingly competitive causing Comcast to lose
material numbers of its subscribers to competitors.

(2)  Customer Service:  Throughout 2007, Comcast
experienced serious customer service problems.  This caused
significant subscriber loss and materially threatened Comcast's
ability to achieve its publicly stated 2007 outlook.

-13-

(3)   Triple Play:  Comcast's record growth in 2006 was
largely due to Comcast's "Triple Play" package, which offered
customers a promotional monthly rate for the first year.
Defendants publicly promoted the Triple Play package as the
primary driver of their 2007 projections.  The success of Triple
Play, however, turned out to be due primarily to the promotional
rate at which the services are being offered and thus somewhat
short lived.  After the initial 12-month promotional rate
expired, customers were required to pay regular "a la carte"
prices for each service, which increased their total monthly cost
by 40-50% or more.  When the promotional price of Comcast's
Triple Play expired for many customers during 2007, some of them
chose to cancel their service with Comcast and subscribe with
Comcast's competitors instead.  Though Comcast had expected a
small measure of customer attrition, it lost more customers
through this transition than it had anticipated.  In an attempt
to retain its Triple Play customers, Comcast also made the
decision to extend the promotional rates for some customers
beyond the initial twelve-month period, which further undermined
its financial outlook.

(4)   FCC Ruling:  Effective July 1, 2007, the FCC
required cable companies to use cable boxes that would be
compatible with all cable providers.  This change would allow
customers to switch providers without changing their set-top box.
The new boxes were more expensive than the boxes previously used
by Comcast, which were not compatible with the services offered

-14-

by other cable companies.  Although Comcast applied for a waiver
from this requirement, it learned on January 10, 2007 that its
request had been denied.  Comcast, therefore, attempted to take
advantage of its current stock of cheaper set-top boxes before
the July 1 deadline and installed an unprecedented 2.1 million of
these boxes by June 30.  There were numerous costs associated
with the deployment of these boxes.  Their price to customers was
deeply discounted to assure that Comcast could clear its
inventory of them.  Additionally, the increase in deployments
resulted in increased advertising, installation and customer
support costs to Comcast.  Defendants were also aware that some
of its competitors had received a waiver of the FCC requirement
and were permitted to continue using the lower-cost boxes.  This
put Comcast at a comparative disadvantage, caused it to lose
price-sensitive customers to competitors, and damaged its ability
to compete for new ones.

(5)  Capital Expenditures for Network Improvements:  By
early 2007, Comcast's level of capital expenditures necessary to
upgrade and maintain its technology and equipment was rising
beyond internal expectations.  Various Comcast Divisions reported
that they were exceeding their capital budgets, and in
particular, the Northern Division repeatedly failed to meet its
monthly budgets as it engaged in an initiative to upgrade its
communication networks.

(6)  Capital Expenditures for Acquisitions:  By early
2007, Comcast's level of capital expenditures necessary to make

strategic cable acquisitions in order to remain competitive and
to integrate those newly acquired cable systems was rising beyond
expectations.  In particular, Comcast acquired substantially all
of the assets of Adelphia Communications in the summer of 2006
and needed to expend significant sums to upgrade the existing
Adelphia network to integrate fully into Comcast's systems.  In
addition, Comcast spent at least $200 million to integrate a
cable system in Houston, Texas which it acquired in January,
2007.

        Plaintiffs allege in their Amended Complaint that
defendants were aware of each of the above undisclosed facts and
that their failure to inform investors about them made their
positive statements and assurances false and misleading.  Because
of these false and misleading statements, plaintiffs maintain
that Comcast common stock traded at artificially inflated share
prices between February 1 and December 4, 2007.  According to the
Amended Complaint, when Comcast common stock lost value on
December 5, 2007, the trading wiped out $5.23 billion in market
capitalization and damaged those who purchased Comcast common
stock during the Class Period.

        As noted above, defendants now move to dismiss the
Amended Complaint pursuant to Rules 12(b)(6) and 9(b) of the
Federal Rules of Civil Procedure and pursuant to the PSLRA.

-16-

II.

Count I of the Amended Complaint alleges that defendants violated § 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder.  Section 10(b) provides:

> It shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Rule 10b-5 declares that "[i]t shall be unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...."  To state a claim for relief under § 10(b), a plaintiff must plead facts demonstrating that "(1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury."  Cal. Pub. Employees' Ret. System v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997)).

Where, as here, a securities fraud claim is being challenged on a motion to dismiss, the claim must satisfy the pleading standard applicable to motions under Rule 12(b)(6) of

the Federal Rules of Civil Procedure.  In addition, the claim
being asserted must satisfy the heightened pleading requirements
of Rule 9(b) of the Federal Rules of Civil Procedure and the
PSLRA.  Id. (citing In re Rockefeller Center Props., Inc. Sec.
Litig., 311 F.3d 198, 217 (3d Cir. 2000)).

        Under Rule 12(b)(6), a claim should be dismissed only
where it "appears beyond doubt that the plaintiff can prove no
set of facts in support of the claim which would warrant relief."
Id. (citation omitted).  While a complaint attacked by a Rule
12(b)(6) motion to dismiss does not need detailed factual
allegations, a plaintiff's obligation to provide the grounds of
his entitlement to relief requires more than labels and
conclusions.  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955,
1964-65 (2007) (internal citations and quotations omitted).  All
well-pleaded allegations in the complaint must be accepted as
true, and all reasonable inferences are drawn in favor of the
non-moving party.  Chubb, 394 F.3d at 143.

        Independent of the standard governing motions to
dismiss under Rule 12(b)(b), Rule 9(b) requires a heightened
pleading standard with respect to factual allegations underlying
a claim of fraud.  It states that:  "In alleging fraud or
mistake, a party must state with particularity the circumstances
constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Our Court
of Appeals has repeatedly made clear that "this particularity
requirement has been rigorously applied in securities fraud
cases."  E.g. In re Rockefeller Center, 311 F.3d at 216 (citation

-18-

omitted).  At a minimum, to meet the stringent requirements imposed by Rule 9(b), plaintiffs in a securities fraud case must support their allegations "with all of the essential factual background that would accompany the first paragraph of any newspaper story - that is, the who, what, when, where and how of the events at issue." Id. at 217 (citations and internal quotations omitted); Chubb, 394 F.3d at 144 (citations omitted). "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." In re Rockefeller Center, 311 F.3d at 216 (citation omitted); Chubb, 394 F.3d at 144 (citations and internal quotations omitted).

In addition to Rule 9(b), the PSLRA "imposes another layer of factual particularity to allegations of securities fraud." In re Rockefeller Center, 311 F.3d at 217; Chubb, 394 F.3d at 144 (citation omitted).  The PSLRA mandates that:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  If this particularity requirement is not met, "the court shall ... dismiss the complaint." Id. at § 78u-4(b)(3)(A).  Our Court of Appeals has held repeatedly that the intent of Congress was to "substantially heighten the

-19-

existing pleading requirements" in securities fraud actions.  In re Rockefeller Center, 311 F.3d at 217 (citing In re Advanta, 180 F.3d 525, 531 (3d Cir. 1999).

Chubb discussed the interplay between Rule 12(b)(6), Rule 9(b), and the PSLRA.  Chubb, 394 F.3d at 145.  The Court explained that:

> [U]nless plaintiffs in securities fraud
> actions allege facts supporting their
> contentions of fraud with the requisite
> particularity mandated by Rule 9(b) and the
> Reform Act [PSLRA], they may not benefit from
> inferences flowing from vague or unspecific
> allegations-inferences that may arguably have
> been justified under a traditional Rule
> 12(b)(6) analysis. ... In other words,
> pursuant to this 'modified' Rule 12(b)(6)
> analysis, 'catch-all' or 'blanket' assertions
> that do not comply with the particularity
> requirements are disregarded.

Id. (internal citations and quotations omitted).

Defendants first argue that the Amended Complaint must be dismissed because plaintiffs do not allege the basis of their allegations of fraud and therefore do not meet the pleading standards established by the PSLRA, as set forth above. Plaintiffs concede in their brief that their allegations regarding the "undisclosed material facts" set forth in the Amended Complaint are based upon their information and belief. Under those circumstances, PSLRA requires that "the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Defendants contend that plaintiffs do not cite to any source for the six "undisclosed material facts" which they allege and thus that plaintiffs'

-20-

allegations cannot meet the particularity requirement imposed by
the PSLRA.

Our Court of Appeals has instructed that "a complaint
can meet the pleading requirement dictated by the PSLRA by
providing sufficient documentary evidence and/or a sufficient
description of the personal sources of the plaintiff's beliefs."
Chubb, 394 F.3d at 147.  If the allegations are based on a
confidential source, the court determining whether the
allegations comply with PSLRA must examine such factors as "the
confidential sources, the sources' basis of knowledge, the
reliability of the sources, the corroborative nature of other
facts alleged, including from other sources, the coherence and
plausibility of the allegations, and similar indicia."  Id.

Plaintiffs appear to be relying exclusively on
documentary evidence as the source of their allegations of fraud,
as they make no mention of any confidential or other personal
sources.  They point to the section in the Amended Complaint
entitled "Defendants' Knowledge of Facts Rendering Their Class
Period Statements False."  This section of the pleading describes
the general process by which various internal company documents
are allegedly generated and reviewed at Comcast.  In particular,
plaintiffs provide an overview of how Comcast's budgets are
created, and how the company tracks subscribers, revenue and
other data on a monthly basis.  Plaintiffs assert that "this type
of detail concerning Comcast's operations, including the type of
reports used to convey important Company metrics to the key

-21-

executives, is sufficient for PSLRA pleading purposes."  Pls.'
Mem. in Opp'n at 38.  We disagree.

The Court of Appeals in Chubb adopted the following
standard for the particularity with which documentary evidence
must be pleaded:  "[A] plaintiff relying on internal reports must
'specify the internal reports, who prepared them and when, how
firm the numbers were or which company officers reviewed them.'"
Chubb, 394 F.3d at 147 (quoting In re Scholastic Corp. Sec.
Litig., 252 F.3d 63, 72-73 (2d Cir.), cert. denied sub nom.,
Scholastic Corp. v. Truncellito, 534 U.S. 1071 (2001)).  In the
present matter, plaintiffs do not identify specific documents
that would contain facts or figures indicating that any of the
"undisclosed true facts" were true or known to the defendants,
much less any other details about the content of those documents.
Plaintiffs' allegations are limited to a "barebones sketch" of
how budget and subscriber data documents are purportedly compiled
and reviewed at Comcast as a general matter.  Plaintiffs'
assertion that the type and amount of detail they provide is
sufficient has been foreclosed by Chubb.  There, the Court of
Appeals explained:  "Cobbling together a litany of inadequate
allegations does not render those allegations particularized in
accordance with Rule 9(b) or the PSLRA."  394 F.3d at 155.
Instead, plaintiffs' failure to identify the specific documents
on which they rely is fatal to their ability to meet the pleading
requirements set forth in the PSLRA.  "Reliance upon alleged
documents which are undated, unquoted, undescribed, and

unattached amounts to nonspecific allegations, at best."  Klein
v. Autek Corp., 2004 WL 3635650, *7 (D.N.J. 2004), aff'd, Klein
v. Autek Corp., 2005 WL 2106622, *4 (3d Cir. 2005).

Plaintiffs' inability to meet the pleading requirement
extends to each of the six "undisclosed material facts" which
underpin their allegations of securities fraud.  With respect to
plaintiffs' allegations that competition steadily increased
throughout the first three quarters of 2007 causing Comcast to
lose material numbers of subscribers, the Amended Complaint cites
to no sources at all.  To the contrary, the Amended Complaint
even documents various instances during the Class Period during
which Roberts, Burke and other Comcast executives acknowledged
that competition in their business had increased.

Nor do plaintiffs cite to any source to uphold their
bare allegation that the expiration of the Triple Play
promotional rate among some customers caused many subscribers to
leave or forced Comcast to continue to offer the promotional rate
to other customers.  This is a fatal omission.

Similarly, the Amended Complaint offers no support
whatsoever for plaintiffs' allegations that Comcast suffered a
variety of consequences from the FCC requirement regarding cable
companies to use mutually compatible set-top boxes.  Moreover,
plaintiffs' admit that Comcast's failure to obtain a waiver from
that FCC requirement occurred on January 10, 2007, before the
start of the class period in the instant action.

-23-

To support their allegations that capital expenditures for network improvements and acquisitions were exceeding expectations, plaintiffs cite to their generic description of how budget and subscriber data documents are purportedly compiled and reviewed at Comcast.  As noted above, this is plainly insufficient under Chubb.  Plaintiffs additionally cite a statement allegedly made by Burke at a manager meeting in September or October of 2007 that Comcast was "missing its numbers."  This statement is unsupported and fails to meet the PSLRA pleading requirement.  Moreover, the statement is extraordinarily vague and does nothing to verify plaintiffs' allegations that capital expenditures were exceeding expectations because more monies were spent on network improvements and acquisitions than were initially projected.

In the same vein, plaintiffs attempt to sustain their allegation that customer service problems during the class period caused Comcast to lose customers by loosely describing the managerial hierarchy by which such problems could have come to the attention of defendant Roberts.  Plaintiffs also reference Roberts' alleged concerns about customer service on one unspecified occasion.  Again, such unsupported allegations do not meet the heightened pleading requirement of the PSLRA.

The decisions on which plaintiffs rely in support of their argument that they have pleaded with sufficient particularity are readily distinguishable from the present matter.  See Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000), In re

-24-

Rent-Way Securities Litigation, 209 F. Supp. 2d 493 (W.D. Pa. 2002), and In re Campbell Soup Co. Securities Litigation, 145 F. Supp. 2d 574 (D.N.J. 2001).  In each, the issue before the court was whether the plaintiffs were required to state with particularity *every* fact upon which their belief was based, or whether plaintiffs could meet the PSLRA standard by pleading with particularity *sufficient* facts to support their claim.  In contrast, this court is considering the very different issue of whether plaintiffs have pleaded facts to support their claim *with particularity*.  The courts in Novak, In re Rent-Way and In re Campbell Soup did not address the question before us.  Indeed, the court in Novak explicitly stated that it "express[ed] no view as to whether the plaintiffs' allegations in this case were sufficiently particularized."  216 F.3d at 314.  Moreover, Novak, In re Rent-Way and In re Campbell Soup were each decided before Chubb, which articulated the appropriate standard of particularity with which documentary support in securities fraud cases must be pleaded.  394 F.3d at 147.  We have already determined that plaintiffs' allegations here do not meet that standard.

        Thus, we will dismiss Count I of the Amended Complaint, which alleges a claim under § 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder.  Because we conclude that the Amended Complaint does not meet the heightened pleading requirements of the PSLRA, we need not reach defendants' additional arguments that the Amended Complaint fails to allege a

statement or omission that is actionable under the securities
laws, to allege scienter sufficiently, or to allege loss
causation.

### III.

Count II of the Amended Complaint asserts a claim
against defendants Roberts and Burke under § 20(a) of the
Securities and Exchange Act.  15 U.S.C. § 78t.  Section 20(a)
provides for securities fraud liability against "controlling
persons," making them jointly and severally liable with the
corporation they control.  Id.  "[I]t is well-settled that
controlling person liability is premised on an independent
violation of the federal securities laws."  In re Rockefeller
Center, 311 F.3d at 211; In re Merck & Co., Inc. Sec. Litig., 432
F.3d 261, 275 (3d Cir. 2005).  Plaintiffs' derivative claim under
§ 20(a) cannot be maintained unless they have brought a viable
underlying violation of the Securities and Exchange Act separate
and apart from their § 20(a) claim.  In re Rockefeller Center,
311 F.3d at 211-12.  Because we will dismiss plaintiffs' only
other claim under the Act, their § 20(a) claim must fail as well.
Id.

### IV.

Plaintiffs also request that, before the court
dismisses the Amended Complaint, they be given leave to file a
Second Amended Complaint to address any deficiencies.  The
Supreme Court has held that although "the grant or denial of an
opportunity to amend is within the discretion of the District

-26-

Court, ... outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of that discretion."  Foman v. Davis, 371 U.S. 178, 182; In re Burlington Coat, 114 F.3d at 1434.  "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."  In re Burlington Coat, 114 F.3d at 1434.

In In re Burlington Coat, our Court of Appeals ruled that when a complaint is dismissed on the grounds of failure to plead with particularity, ordinarily leave to amend is granted. Id.  The court noted, however, that when a plaintiff has already been granted an opportunity to amend his complaint, permitting a second amendment could result in prejudice to the defendants. Id.  We find this to be the case in the instant matter. Plaintiffs' original Complaint was filed in January, 2008.  After defendants filed a motion to dismiss that Complaint, plaintiffs filed an Amended Complaint as permitted under Rule 15(a). Plaintiffs are represented by sophisticated counsel who represented to the court that they are "firms which have substantial experience in the prosecution of shareholder and securities class actions."  Pls.' Mem. in Supp. of their Mot. to Appoint Lead Pl. at 8.  Under these circumstances, wherein defendants have already had to defend against two complaints in the matter, allowing the plaintiffs a third bite at the pleading apple would result in prejudice to the defendants.  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1332-33 (3d Cir. 2002).

-27-

Plaintiffs' request for leave to file a Second Amended Complaint will therefore be denied.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARILYN CLARK, et al.          :          CIVIL ACTION
                               :
              v.               :
                               :
COMCAST CORP., et al.          :          NO. 08-52

ORDER

        AND NOW, this 25th day of August, 2008, for the reasons
set forth in the accompanying Memorandum, it is hereby ORDERED
that:

        (1)  the motion of defendants Comcast Corporation,
Brian Roberts and Stephen Burke to dismiss the Amended Complaint
is GRANTED; and

        (2)  the request of plaintiffs for leave to file a
Second Amended Complaint is DENIED.

                              BY THE COURT:


                              /s/ Harvey Bartle III
                                                    C.J.